FILED & JUDGMENT ENTERED
Christine F. Winchester

June 24 2024

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_Laura T. Beyer_
Laura T. Beyer
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| **PLI Y HMOK** ) | Chapter 13 |
| **JANE H NGOAN KSOR,** ) | Case No. 19-30876 |
| ) | |
| Debtors. ) | |
| _____) | |

## ORDER DENYING DEBTORS' MOTION TO MODIFY PLAN

**THIS MATTER** comes before the court on the March 21, 2023 Motion by Debtors to Modify Chapter 13 Plan and to Designate Separate Classification of Certain Unsecured Claims to be Provided for by the Plan and Application for Additional Attorney's Fees (the "Motion"). The court conducted an evidentiary hearing on the Motion on September 26, 2023 and issued its ruling at a continued hearing on October 24, 2023. The female Debtor; her attorney, Matthew Crow; and the Chapter 13 Trustee, Jenny Holman, appeared at the September 26 hearing. For

1

the reasons that follow, the court **DENIES** the Debtors' request to modify the plan, **GRANTS** the Debtors' request to separately classify certain unsecured claims, and **APPROVES** the application for additional attorney's fees.

## FINDINGS OF FACT

On June 27, 2019, the Debtors filed a petition for relief under Chapter 13 of the Bankruptcy Code. At the time of the filing, the Debtors were the owners of real property located at 1201 Jordans Pond Lane, Charlotte, North Carolina 28214 (the "Real Property"). The Debtors properly disclosed the Real Property on Schedule A/B and listed the nature of their ownership interest as "Tenancy by the Entireties." In addition, the Debtors valued the Real Property at $188,000 based on the "county tax value." On their Schedule D, the Debtors listed "Serivsolutions"[1] as having a lien against the Real Property in the amount of $139,000. The Debtors claimed a homestead exemption pursuant to North Carolina General Statute section 1C-1601(a)(1) in their Schedule C to exempt an equity interest of $49,000. On August 13, 2019, the Alabama Housing Finance Authority (also known as ServiSolutions) filed a proof of claim evidencing a secured claim in the amount $132,696.13 with no prepetition arrearage. Therefore, at filing, based on the original valuation of the Real Property and the amount due on the ServiSolutions lien, the Debtors had equity in the Real Property of $55,303.87, an amount that is less than their available homestead exemption.

---

[1] This appears to have been a typo. The correct spelling of the creditor's name is "ServiSolutions."

2

The Debtors' plan as confirmed on September 5, 2019 required them to make payments of $2,010 per month to the Chapter 13 Trustee for a 1% dividend to their general unsecured creditors. The Debtors represented that their plan would be funded by their future income and made no reference to selling the Real Property in either their plan or schedules. On February 12, 2021, citing the effect of the COVID-19 pandemic on their finances, the Debtors moved to modify their plan to increase the term to 84 months and reduce their plan payment to $1,735. After a hearing, the court entered an order granting their motion to modify and reducing their payments to $1,750 on March 12, 2021. This reduced plan payment maintained a dividend of 1% to the general unsecured creditors. Since that modification, due to a default in payments, the Debtors' required plan payment increased gradually to maintain the 1% payout. As of September 2023, the Debtors' plan payment was $2,330, and they were 48 months from confirmation and 51 months from filing. At that point, the Debtors had not made a plan payment since October 3, 2022.

On February 5, 2023, the Debtors filed a motion to sell the Real Property to an unrelated third party for $280,000. When they filed the motion to sell, the Debtors anticipated net sale proceeds of approximately $140,000 after paying the lien held by ServiSolutions and closing costs. In addition, the Debtors sought to amend their homestead exemption to claim $65,000. The motion to sell did not include a request to modify the plan, but the Debtors indicated that they planned to seek a plan modification after the sale closed.

The court granted the Debtors' motion to sell, and the court conducted a status hearing on March 21, 2023. At the status hearing, the Trustee reported that she had received the closing statement and non-exempt net sales proceeds of $51,228.76. The same day, the Debtors filed the Motion which sought to modify their plan to use a portion of the proceeds held by the Trustee to pay off their plan at 1% with the remaining proceeds turned over to the Debtors. In support of their request, the Debtors stated that prior to the sale, they owned the Real Property as tenants by the entirety and there were no joint unsecured claims in the case. The Motion explains that the Debtors' plan, as confirmed and subsequently modified, called for monthly payments of $2,330, which included a mortgage payment of $1,220 per month to ServiSolutions. The Motion classifies the general unsecured claims as either claims of the male Debtor or claims of the female Debtor. Finally, the Motion asks the court to modify the Debtors' plan to allow a lump sum payment of $35,000 from the sale proceeds to be applied to their plan for a 1% payout to the general unsecured creditors with the remaining proceeds disbursed to the Debtors since there were no joint claims in the case. The Debtors filed a memorandum of law on July 20, 2023 and a reply brief on September 19, 2023 to support their Motion. The Debtors' briefs argue that the sale proceeds maintain the tenancy by the entirety protection and should only be available to joint creditors because the Debtors owned their property as tenants by the entirety at filing. Additionally, the Debtors argue that the proceeds substitute for lost income and are not a substantial improvement in the Debtors' financial

4

condition, so they should be entitled to keep the proceeds and use them to pay off their Chapter 13 plan.

The Trustee filed her responsive memorandum of law on September 6, 2023, opposing the Debtors' Motion. The Trustee argues that because the Debtors voluntarily sold their property, the cash proceeds of the sale lose the tenancy by the entirety protection and should be distributed to the Debtors' unsecured creditors as non-exempt equity.

In support of their Motion, the Debtors filed amended Schedules I and J on September 19, 2023. The amended schedules show that the Debtors had a monthly net income of negative $648.33. When this case was filed on June 27, 2019, the Debtors had a monthly net income of $2,024. Both budgets show the male Debtor's employment as a roofer and the female Debtor's as a nail technician.

At the hearing held on September 26, 2023, the female Debtor testified about the Debtors' current financial circumstances as well as their education and work history. The female Debtor stated that she had a high school degree and the male Debtor dropped out of high school but later earned his GED. She told the court that the male Debtor was still employed as a roofer, although he worked for a different company. The male Debtor started working for his current employer in March 2023, is paid $23 per hour, and often travels out of state for jobs. The female Debtor testified that she had been laid off from her part-time job as a nail technician a couple of days before the hearing. She had been working at a nail salon on Saturdays, where she was paid purely on commission and would make between $0 and $180 each

5

Saturday depending on how busy it was. Prior to being laid off, she developed an allergy to the chemicals used for her work. She noted that her doctor informed her she was allergic to the chemicals and she should stop working as a nail technician. She added that she had not looked for another job because the family only had one car. The female Debtor also testified that the Debtors and their four minor children, ages 6 to 13, moved in with her parents after they sold their home. She explained that they pay her parents $1250 in rent and an additional $580 per month for a storage unit with furniture and other items from their old house.

## CONCLUSIONS OF LAW

There is no dispute that the Debtors owned their residence as tenants by the entirety when they filed their case and that they maintained ownership of the Real Property until it was sold. The Debtors, however, argue that this form of ownership at the commencement of a bankruptcy case creates a permanent exemption that cannot be extinguished during the case. Consequently, the Debtors argue that the tenancy by the entirety exemption can further be used to exempt personal property proceeds from the post-petition sale of real property owned by the Debtors as tenants by the entirety. The Debtors, therefore, seek to have the Trustee turn over a portion of the proceeds from the sale of the residence as exempt pursuant to the tenancy by the entirety exemption. The court disagrees and concludes that the proceeds from the sale of the Real Property are not exempt pursuant to the tenancy by the entirety exemption.

6

### A. The tenancy by the entirety exemption applies to real property assets and terminates upon the voluntary sale of real property.

North Carolina recognizes tenancy by the entirety, a form of co-ownership of real property held by husband and wife with the right of survivorship. See North Carolina General Statute § 41-46. However, there is no separate tenancy by the entirety exemption listed in the state's exemption statute, North Carolina General Statute section 1C-1601. The only reference to the concept appears in section 1C-1601(a)(1) where it is listed as one of the elements of an enhanced homestead exemption for elderly debtors whose former co-owner is deceased.

The Bankruptcy Code, however, includes a tenancy by the entirety exemption. Debtors may use the exemption set forth in 11 U.S.C. § 522(b)(3)(B) to exempt "any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by entirety or joint tenant is exempt from process under applicable nonbankruptcy law." This exemption is available even if the Code requires a debtor to use state exemptions. See Schlossberg v. Barney, 380 F.3d 174, 178 (4th Cir. 2004) (citing § 522(b)(2)(B)). The tenancy by the entirety exemption is similar to the exemption described in section 522(b)(3)(C) which allows a debtor to exempt retirement accounts that are "exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code." Unlike the retirement account exemption, see § 522(b)(4)(C) & (D), there is no further provision that explains how and when the tenancy by the entirety exemption should terminate, but section 522(b)(3)(B), which allows debtors to exempt property owned as tenancy by

7

the entirety "to the extent that such interest . . . is exempt from process under applicable bankruptcy law," suggests that state law determines the termination of the exemption.

The Debtors contend that because they owned their property as tenants by the entirety pre-petition, the proceeds from their voluntary sale of the property retain their designation as entirety property and therefore remain exempt from individual creditors. The relevant North Carolina law does not support that argument.

In support of their position, the Debtors cite section 41-63(1) of the North Carolina General Statutes. That statute, however, provides that one of the events that terminates a tenancy by the entirety is:

> [t]he voluntary sale and conveyance of property held as tenants by the entirety to a third party, including a foreclosure sale pursuant to a power of sale in a deed of trust. Proceeds of the sale, including surplus funds generated from a foreclosure sale, are personal property held by the spouses as tenants in common.

Similarly, well-established case law provides that "a tenancy by the entirety may be terminated by the voluntary joint acts of the husband and wife, such as where the husband and wife voluntarily sell or convey the property, in which event the proceeds from the sale become property in common." See In re Surles, No. 01-13070C-7G, 2003 WL 2006846, at *2 (Bankr. M.D.N.C. May 1, 2003) (citing Koob v. Koob, 283 N.C. 129 (1973)). In Surles, the court found that a trustee's sale of the debtors' residence was involuntary and held that the involuntary sale did not terminate the tenancy by the entirety. Id. Unlike in Surles, the Debtors listed the Real Property with a realtor

8

and sought the permission of the court before voluntarily proceeding with the sale. The Debtors were not forced into the sale by a trustee or any other party.

The Debtors also cite In re Foreclosure of Deed of Tr. Recorded in Book 911, at Page 512, Catawba Cty. Registry, 303 N.C. 514 (1981), in support of their position. In Deed of Tr., however, the North Carolina Supreme Court ruled that surplus funds generated by a foreclosure sale pursuant to a power of sale in a deed of trust on entirety property are held by the husband and wife as tenants in common. Id. at 515–17. The court in Deed of Tr. reached that decision by finding that the foreclosure sale was not involuntary due to the homeowners' voluntary decision to buy realty and subject it to a deed of trust. Id. at 518. The Debtors' sale in this case was entirely voluntary, and thus the proceeds are not entirety property and are held as tenants in common.

The other cases cited by the Debtors also fail to support their position that the proceeds from the voluntary sale of the Real Property retain their designation as tenants by the entirety property and remain exempt as to their joint unsecured creditors. Thus, pursuant to section 41-63(1) and North Carolina case law, only real property can be owned as a tenancy by the entirety, and proceeds from the voluntary sale of entirety property cannot be held by the entirety. The proceeds from the sale of the Debtors' residence are not protected by the tenancy by the entirety exemption due to the voluntary sale of the residence.

9

**B. The proceeds of a voluntary post-petition sale of real property are property of the estate in a chapter 13 case.**

In their July 20, 2023 memorandum of law, the Debtors argue that the sale proceeds, regardless of their exemption status after the sale, are not available to their creditors since the "petition filing date is determinative of the nature and scope of the property of the estate and is also used to determine the rights of all creditors connected with the bankruptcy case." This argument relies on the notion that the liquidation analysis of 11 U.S.C. § 1325(a)(4) is fixed at the petition date and does not change.

In framing their argument, the Debtors cite this court's decision in the Chapter 7 case In re Bronikowski, 569 B.R. 48, 49 (Bankr. W.D.N.C. 2017). The Debtors cite this case to allege this court's approval of Vogel v. Palmer (In re Palmer), 57 B.R. 332 (Bankr. W.D. Va. 1986) and the proposition that "[s]ection 541 clearly establishes that the estate is created when the petition is filed. This date is the critical time as of which the property comprising the estate is to be determined and the rights of others connected with the proceeding adjusted." Id. at 333–34 (citing 4 COLLIER ON BANKRUPTCY ¶ 541.04, at 541–22 (15th ed. 1985)).

There is no question that section 541 of the Code defines what is included as property of the estate. It is also undisputed that the bankruptcy estate for each spouse includes all legal or equitable property interests of that spouse as of the commencement of the case and such interests include the debtor's interest in property owned as tenants by the entirety. Cordova v. Mayer (In re Cordova), 73 F.3d 38, 40 (4th Cir. 1996); Fairfield v. United States (In re Ballard), 65 F.3d 367, 371 (4th Cir.

10

1995). The Bronikowski analysis does not apply to the current case, however, because Bronikowski was a Chapter 7 case, not a Chapter 13 case. The Debtors' analysis of Bronikowski ignores the footnote that specifically notes that the outcome would be different in a Chapter 13 case because "[a] bonus received by a Chapter 13 debtor during the pendency of her case would be property of her estate due to Bankruptcy Code provisions specific to Chapter 13." Bronikowski, 569 B.R. at 52 n.1 (citing 11 U.S.C. § 1306(a)). Section 1306 of the Code expands the definition of property of the estate to include "all property of the kind specified in [§ 541] that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted." § 1306(a)(1).

Therefore, Palmer can be distinguished from the present case because it considered the question of whether a post-petition bonus was property of a Chapter 7 estate. See Palmer, 57 B.R. at 332–33. The Palmer court found that the bonus at issue was "sufficiently rooted in post-petition events so as to constitute after-acquired property which would not pass to the Trustee as property of the estate." Id. at 337 (quoting McCracken v. Selner (In re Selner), 18 B.R. 420, 421–22 (Bankr. S.D. Fla. 1982)). However, the court in Palmer, like the court in Bronikowski, inserted a footnote acknowledging that interest in a pension fund "may become estate property in a Chapter 13 Plan once paid to the debtor under the terms of the trust since Chapter 13 debtors must commit their future earnings to the Plan." Id. at 334 n.1

11

(citing McLean v. Cent. States, Se. & Sw. Areas Pension Fund, 762 F.2d 1204 (4th Cir. 1985);[2] § 1306(a)(6);[3] 2 NORTON BANKRUPTCY LAW & PRACTICE ¶ 29.12 N. 1).

Finally, the Debtors argue that the "snapshot" doctrine prevents the form of ownership from changing during the bankruptcy case and that the rights of a debtor are locked in as of the petition date. The Debtors cite In re Rockwell, 590 B.R. 19, 28 (Bankr. D. Me. 2018), aff'd sub nom. Hull v. Rockwell, 610 B.R. 1 (D. Me. 2019), aff'd sub nom. In re Rockwell, 968 F.3d 12 (1st Cir. 2020), in support of this proposition. In Rockwell, the debtor originally filed a Chapter 13 case and received proceeds from the sale of his house during that case but "failed to reinvest all of the proceeds in a new residence before he converted his case to one under chapter 7." Id. at 21. The bankruptcy court held that the "complete snapshot" rule applied so the debtor's exemptions were evaluated as of the day he filed bankruptcy. Id. at 24–27. The First Circuit agreed with the bankruptcy court and held that the debtor's homestead exemption maintained the same status it held on the day of filing. Rockwell, 968 F.3d at 16. The Court of Appeals, however, made clear that its holding was applicable only to cases where there was a conversion from a Chapter 13 case to a Chapter 7 case, and it specifically declined to decide what the outcome would be in a case where there was no conversion to Chapter 7. Id. at 22 & n.7.

---

[2] Although McLean went on to find that the pension at issue was not property of the estate, that conclusion was based on whether transfer restrictions in the pension trust agreement were enforceable under applicable nonbankruptcy law. McLean, 762 F.2d at 1206–07.

[3] Section 1306(a) does not and has never included a subsection (6), see An Act to Establish a Uniform Law on the Subject of Bankruptcies, Pub. L. No. 95-598, § 1306, 92 Stat. 2549, 2647 (1978), so the citation to section 1306(a)(6) appears to be a typo. The Palmer court may have been thinking of section 541(a)(6) which is discussed extensively on the same page of the opinion. See Palmer, 57 B.R. at 334.

12

In short, none of the cases cited by the Debtors in support of their theory that their exemption in the Real Property was determined as of the date of filing were decided under Chapter 13 of the Code, and none of them analyzed the effect of section 1306.[4] While the Debtors would like for the analysis to end with section 541, that argument ignores the effect of section 1306. The voluntary sale of the residence by the Debtors resulted in the termination of the tenancy by the entirety pursuant to state law, and any exemption created by the Bankruptcy Code was extinguished even though the voluntary sale occurred post-petition. The proceeds are therefore non-exempt assets and available to the bankruptcy estate.

**C. The realization of appreciation through the sale of the Real Property constitutes a substantial and unanticipated change in the Debtors' financial condition and is a basis for modification of the plan.**

The Debtors sold real property prior to the completion of payments under their Chapter 13 plan and realized a roughly 49% increase in the value of the property since the filing of their petition. These facts are similar to In re Murphy, 474 F.3d 143 (4th Cir. 2007), and clearly justify a modification of the Debtors' plan to increase the dividend to unsecured creditors. By the same token, the Debtors' receipt of such a windfall bars their attempt to modify the plan.

Chapter 13 plans are binding on the parties to a case and are accorded an appropriate level of finality. Id. at 148–49. The Code provides that "[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of

---

[4] The following cases cited by the Debtors were all Chapter 7 cases: In re Cunningham, 513 F.3d 318 (1st Cir. 2008); In re Zibman, 268 F.3d 298 (5th Cir. 2001); In re Leicht, 222 B.R. 670 (B.A.P. 1st Cir. 1998). The final case cited by the Debtors commenced as a Chapter 11 case and converted to a Chapter 7: In re Hatu, No. 19-05428-5-JNC, 2022 WL 1436051 (Bankr. E.D.N.C. May 5, 2022).

13

such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." § 1327(a). Nevertheless, Chapter 13 plans may be modified as described in section 1329:

> (a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—
> (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;
> (2) extend or reduce the time for such payments;
> (3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan; or
> (4) reduce amounts to be paid under the plan by the actual amount expended by the debtor to purchase health insurance for the debtor . . . .

As this court pointed out in In re Runnels, "[w]hile § 1329 sets some requirements for the modification of a Chapter 13 plan, it 'does not explicitly state what justifies such a modification.'" 530 B.R. 626, 629 (Bankr. W.D.N.C. 2015) (quoting In re Arnold, 869 F.2d 240, 241 (4th Cir. 1989)). Despite the lack of clarity from the Code on what constitutes grounds for modification, the Fourth Circuit has held that "it is well-settled that a substantial change in the debtor's financial condition after confirmation may warrant a change in the level of payments." Arnold, 869 F.2d at 241 (citing Educ. Assistance Corp. v. Zellner, 827 F.2d 1222, 1226 (8th Cir. 1987); In re Fitak, 92 B.R. 243, 248–50 (Bankr. S.D. Ohio 1988); In re Gronski, 86 B.R. 428, 432 (Bankr. E.D. Pa. 1988); In re Owens, 82 B.R. 960, 966 (Bankr. N.D. Ill. 1988); In re Moseley, 74 B.R. 791, 799 (Bankr. C.D. Cal. 1987); In re Tschiderer, 73 B.R. 133, 134 (Bankr. W.D.N.Y. 1987)).

14

In Murphy, the Fourth Circuit considered two separate cases involving a Chapter 13 trustee's motions to modify Chapter 13 plans to increase the amount paid to unsecured creditors. 474 F.3d at 145. The two cases analyzed in Murphy were Mr. Murphy's case, which involved the sale of real property, and the Goralskis' case, which involved an inheritance. Id. Murphy sought to use the proceeds from the sale of his condominium to pay off his plan in a lump sum. Id. at 147. In analyzing whether the sale of real property for a significant gain constituted grounds for modification of the confirmed plan, the Fourth Circuit observed that the debtor sold his real property after a "51.6 percent increase [in the value of the property] in only eleven months." Id. at 152. The court concluded that "[u]nquestionably, the money received by Murphy on the sale of his condominium represents a 'substantial' improvement in Murphy's financial condition." Id. Because the trustee proposed the modification to Mr. Murphy's plan "in good faith to prevent Murphy from receiving such a substantial windfall," "the bankruptcy court did not abuse its discretion when it modified Murphy's confirmed plan to provide for full payment of the pending unsecured claims." Id. at 153.

In this case, the Debtors' original Schedule A/B valued the Real Property at $188,000, which serves as the starting point for evaluating the Debtors' change in circumstances. The Debtors exempted their equity interest of $49,000 on Schedule C using the homestead exemption under North Carolina General Statute section 1C-1601(a)(1). As of the date of filing, the Debtors' interest in the Real Property was fully exempt. The Debtors then sold the Real Property for $280,000, a gain of $92,000

15

or 49%, in less than four years. As in Mr. Murphy's case, the net sale proceeds in this case exceed the Debtors' homestead exemption and represent a substantial improvement in the Debtors' financial position. As a result, like in Murphy, the plan must be modified to account for the substantial and unanticipated appreciation of the Real Property. Because the Debtors here already received the amount of their homestead exemption and have voluntarily severed the tenancy by the entirety, the remaining balance of the sale proceeds should be distributed to unsecured creditors.

### D. The Debtors' current financial position does not support their argument that they should be allowed to keep the sale proceeds.

The companion case decided in Murphy was the case of Stanley and Doris Goralski. Id. at 146. The Debtors argue that their situation is more like the Goralskis' than Mr. Murphy's. In the Goralskis' case, Mr. Goralski's income was reduced by about 50% and the debtors were having trouble affording their plan payments and their ordinary and necessary living expenses. Id. at 145. Due to the reduction in income, the Goralskis sought permission to refinance the mortgage on their residence. Id. at 146. In doing so, they received some of the equity in their residence in cash. Id. The trustee moved to modify the plan to account for the cash, but the Fourth Circuit agreed with the courts below and held that the cash was simply given in exchange for an equal amount of debt and did not represent a substantial change in the Goralskis' financial condition. Id. at 146, 150. Because the Goralskis did not experience a substantial change in their financial condition, the court concluded that "the cash-out refinancing cannot provide a basis for modifying the Goralskis' confirmed plan under §§ 1329(a)(1) or (a)(2)." Id. at 150.

16

The Debtors in the instant case, unlike the Goralskis, did not exchange the sale proceeds for an equal amount of debt. They voluntarily sold their residence and realized a significant gain on the sale, similar to Mr. Murphy. The monthly mortgage payment on their previous residence was $1,136.85, and the Debtors now pay $1,500 in rent and $580 for a storage unit, but that is the result of their voluntary decision to sell their home.

The Debtors cite also this court's opinion in In re Griffin, Ch. 13 No. 04-32325, slip op. (Bankr. W.D.N.C., Oct. 27, 2008) (order denying motion to modify), to support their argument that the sale proceeds did not constitute a substantial improvement in their financial condition. In Griffin, the female debtor received a lump sum from an insurance policy after the death of the male debtor. Id. at 2–3. The female debtor had worked for the male debtor in a small family business, leaving her unemployed and the sole caretaker of their three dependent children upon her husband's passing. Id. The female debtor sought employment but had little job training and was working towards a teaching certificate, which she believed would enable her to make approximately $1,000 per month. Id. at 3. In reviewing Ms. Griffin's situation, the court found that although she experienced an unanticipated change in her post-confirmation financial condition, that change "has not been a change for the better and could not be characterized as substantial." Id. at 8. She had received substantial insurance proceeds due to the death of her husband, but his death caused a financial strain on the family finances, and she was "no better off financially." Id. at 8–9.

17

In this case, although the female Debtor testified that she lost her part-time job, she also stated that the male Debtor was still employed. There was no evidence that the female Debtor, who the court found to be intelligent and articulate, could not obtain employment in another field making similar or better pay than her previous employment. In addition, the Debtor testified that she and her family moved in with her parents upon the sale of their home and therefore, presumably, the female Debtor would have some assistance caring for the couple's four dependent children. Therefore, the court concludes that the current financial circumstances of the Debtors do not support the argument that the sale proceeds are a replacement for lost income or needed to pay the necessities of the Debtors.

## CONCLUSION

The Debtors owned the Real Property as tenants by the entirety when they filed bankruptcy, but that protection ended when they voluntarily sold the property and realized considerable cash proceeds. The cash proceeds flowed into the bankruptcy estate under 11 U.S.C. § 1306 leaving the Debtors with only their homestead exemption to shield a portion of the proceeds. The remaining, non-exempt proceeds represent a substantial and unanticipated change in financial circumstances and are therefore a basis to modify the plan. Accordingly, the Debtors' request to modify their plan is **DENIED**, and the Debtors' request to designate separate classification of certain unsecured claims and application for additional attorney's fees are **GRANTED**. The Trustee is hereby authorized to disburse the sale proceeds in the Trustee's escrow account totaling $51,183.76 to the Debtors'

unsecured creditors according to the separate classification set forth in the Motion, allowing for a distribution of at least 100% to the female Debtor's creditors and at least 23% to the male Debtor's creditors.

**SO ORDERED.**

This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of the Order

United States Bankruptcy Court